UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

THE STATE OF NEW YORK and ALEXANDER
B. GRANNIS, as Commissioner of the New York
State Department of Environmental Conservation,

                      Plaintiffs,

      -against-

WEST SIDE CORP., SHELDON F. SCHIFF,
DOW CHEMICAL COMPANY, ETHYL
CORPORATION and PPG INDUSTRIES, INC.,

                      Defendants.
-------------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ OCT 10 2007 ★
BROOKLYN OFFICE

COMPLAINT

CIV 07-

CV 07 4231

GO. M.J.

VITALIANO, J.

The State of New York and Alexander B. Grannis, as Commissioner of the New York State Department of Environmental Conservation ("DEC") and Trustee of the State's Natural Resources, by their attorney, Andrew M. Cuomo, Attorney General of the State of New York, allege as follows:

### PRELIMINARY STATEMENT

1. This action is brought pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq., and New York's common law of public nuisance, restitution, and indemnification to recover costs that have been and will be incurred by the State in responding to the release and threatened release of hazardous substances at or from a facility known as the West Side Corporation Site located at 107-10 180th Street in Jamaica, Queens, New York (the "Site"), and to redress harm to the public health and environment of the State resulting from the defendants' acts and omissions at the Site.

2. The Site is approximately 4.5 acres in size and contains a two-story brick building which was used as a storage and distribution center for dry-cleaning chemicals.

3. Hazardous substances, released from the Site have contaminated the soil and groundwater at and in the vicinity of the Site and have threatened public health and the environment.

4. Defendants include the current owners, the former operators of the Site, parties that arranged for the disposal of hazardous substances at the Site ("arrangers"), and the successors to such entities.

5. Plaintiffs seek judgment:

(a) directing reimbursement of plaintiff State's past and future costs in responding to such contamination;

(b) awarding the State damages for injury to the natural resources of the State, including the costs of assessing such damages; and

(c) awarding the State recovery of its enforcement costs and interest.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to §§ 107(a) and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(b), and 28 U.S.C. § 1331, and has supplemental jurisdiction over the common law claims under 28 U.S.C. § 1367. The Court also has jurisdiction to enter a declaratory judgment under 28 U.S.C. §§ 2201 and 2202, as well as 42 U.S.C. § 9613.

7. Venue is proper in this District pursuant to § 113(b) of CERCLA, 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because the facility is located, the claims arose and the

threatened and actual release of hazardous substances have occurred in this District.

## FACTS COMMON TO ALL CLAIMS
### PARTIES

8. Plaintiff State of New York, as a body politic and a sovereign entity, brings this action on behalf of itself and as parens patriae, trustee, guardian, and representative on behalf of all residents and citizens of the State, particularly those individuals who live in the vicinity of the Site.

9. Plaintiff Alexander B. Grannis, as Commissioner of DEC and Trustee of the State's natural resources, brings this action pursuant to § 107(f)(2)(b) of CERCLA, 42 U.S.C. § 9607(f)(2)(b), to recover damages for injury to, or loss of the State's natural resources.

**Owners and Operators of the Site**

10. Upon information and belief, Defendant West Side Corporation ("West Side") is a corporation organized and existing under the laws of the State of New York with its principal place of business located at 107-10 180th Street, Jamaica, New York. West Side is the current owner of the Site. From about 1969 to 1990, West Side operated a storage and distribution center on the Site for perchlorethylene, also known as tetrachloroethylene, Perc or PCE ("PCE").

11. Upon information and belief, defendant Sheldon F. Schiff ("Schiff") is an officer and principal shareholder of Defendant West Side.

12. Upon information and belief, defendant Schiff actively participated in decision-making with regard to the management and operations of defendant West Side, including the handling of hazardous substances at the Site, and in decision-making regarding compliance with environmental regulations at the Site.

3

### Arrangers at the Site

13. Defendant PPG Industries, Inc. ("PPG"), is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania.

14. PPG contracted with defendant West Side to supply it with PCE for redistribution or "repackaging."

15. Upon information and belief, PPG transported the PCE to the Site by railroad tanker cars and trucks.

16. Upon information and belief, PPG transferred PCE from the railroad tanker cars and trucks to Aboveground Storage Tanks ("ASTs") located outside the southeast portion of the building on the Site.

17. Upon information and belief, the ASTs had no secondary containment and/or spill prevention restraints.

18. Upon information and belief, spills and leakage would necessarily occur during the transfer of PCE from the rail tanker cars and trucks to the ASTs and during the storage of PCE in the ASTs.

19. Upon information and belief, spills and leakage of PCE were inherent in the transfer and storage process arranged by PPG.

20. Upon information and belief, spills and leakage would necessarily occur during the transfer of PCE from the ASTs to the Site building through underground pipes and spills and leakage of PCE were inherent in the transfer process arranged by PPG.

21. Upon information and belief, PPG had contemporaneous knowledge of the

spills and leakage at the Site.

22. Upon information and belief, PPG personnel frequently inspected the facility and West Side permitted PPG representatives access to, and proper facilities to inspect the use, storage, handling and repackaging of the PCE.

23. Upon information and belief, PPG provided guidance and recommendations for measuring and accounting for the loss of PCE inventory and gave technical advice to West Side regarding the proper storage and handling of PCE.

24. Upon information and belief, PPG owned the PCE before, during and immediately after the transfer by railroad tanker car to the Site building.

25. Upon information and belief, defendant Dow Chemical Company ("Dow"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Midland, Michigan.

26. Upon information and belief, defendant Dow contracted with defendant West Side to supply it with PCE for redistribution or repackaging.

27. Upon information and belief, Dow transported the PCE to the Site by railroad tanker cars and trucks.

28. Upon information and belief, Dow transferred PCE from the railroad tanker cars and trucks to ASTs located outside the southeast portion of the Site building.

29. Upon information and belief, the ASTs had no secondary containment and/or spill prevention restraints.

30. Upon information and belief, spills and leakage would necessarily occur during the transfer of PCE from the railroad tanker cars and trucks to the ASTs and during the

storage of PCE in the ASTs.

31. Upon information and belief, spills and leakage of PCE were inherent in the transfer and storage process arranged by PPG.

32. Upon information and belief, spills and leakage would necessarily occur during the transfer of PCE from the ASTs to the Site building through underground pipes and spills and leakage of PCE were inherent in the transfer process arranged by Dow.

33. Upon information and belief, Dow had contemporaneous knowledge of the spills and leakage at the Site.

34. Upon information and belief, Dow personnel frequently inspected the facility and West Side permitted Dow representatives access to, and proper facilities to inspect the use, storage, handling and repackaging of the PCE.

35. Upon information and belief, Dow provided guidance and recommendations for measuring and accounting for the loss of PCE inventory and gave technical advice to West Side regarding the proper storage and handling of PCE.

36. Upon information and belief, Dow owned the PCE before, during and immediately after the transfer by railroad tanker car to the Site building.

37. Upon information and belief, defendant Ethyl Corporation ("Ethyl") is a corporation organized and existing under the laws of the State of Virginia with its principal place of business in Richmond, Virginia.

38. Upon information and belief, defendant Ethyl contracted with defendant West Side to supply it with PCE for redistribution or repackaging.

39. Upon information and belief, Ethyl transported the PCE to the Site by railroad

tanker cars and trucks.

40. Upon information and belief, Ethyl transferred PCE from the railroad tanker cars and trucks to ASTs located outside the southeast portion of the Site building.

41. Upon information and belief, the ASTs had no secondary containment and/or spill prevention restraints.

42. Upon information and belief, spills and leakage would necessarily occur during the transfer of PCE from the railroad tanker cars and trucks to the ASTs and during the storage of PCE in the ASTs.

43. Upon information and belief, spills and leakage of PCE were inherent in the transfer and storage process arranged by Ethyl.

44. Upon information and belief, spills and leakage would necessarily occur during the transfer of PCE from the ASTs to the Site building through underground pipes and spills and leakage of PCE were inherent in the transfer process arranged by Dow.

45. Upon information and belief, Ethyl had contemporaneous knowledge of the spills and leakage at the Site.

46. Upon information and belief, Ethyl personnel frequently inspected the facility and West Side permitted Ethyl representatives access to, and proper facilities to inspect the use, storage, handling and repackaging of the PCE.

47. Upon information and belief, Ethyl provided guidance and recommendations for measuring and accounting for the loss of PCE inventory and gave technical advice to West Side regarding the proper storage and handling of PCE.

48. Upon information and belief, Ethyl owned the PCE before, during and

7

immediately after the transfer by railroad tanker car to the Site building.

### Operation and Environmental Conditions at the Site

49. Upon information and belief, West Side stored PCE in five 10,000 gallon ASTs, which were located outside the southeast portion of the Site building. The ASTs were filled by railroad tanker cars and /or truck tankers. The rail siding was located between the building and the ASTs. The PCE was pumped from the ASTs by underground pipes at the Site building and dispensed into 55-gallon drums onto delivery vehicles at a loading dock located at the southern portion of the building for distribution to dry cleaners.

50. Four former drinking water supply wells were located adjacent to the Site on property owned by the New York City Department of Environmental Protection ("NYCDEP") and formerly owned by the Jamaica Water Supply Company. NYCDEP has taken the supply wells out of service due to groundwater contamination migrating from the Site.

51. Groundwater below the Site is part of the Long Island aquifer system, a sole source aquifer.

52. On information and belief, EEA, Inc., environmental consultants, conducted a subsurface investigation, on behalf of a potential purchaser for the Site, and found that the groundwater contained 50,000 parts per billion ("ppb") of PCE and soil up to 3,100,000 ppb of PCE. These levels of contamination are far above standards, criteria and guidelines adopted by the State.

53. In August 1997, based on the results of EEA, Inc.'s investigation, DEC designated the Site as an inactive hazardous waste disposal site, as that term is defined at Environmental Conservation Law ("ECL") § 27-1301(2) *et seq.* (McKinney's 1996) and listed the

Site in the Registry of Inactive Hazardous Waste Disposal Sites in New York State ("Registry") as West Side Corporation Site with Site Number 241026, pursuant to ECL § 27-1305. DEC has classified the Site as a Class "2" Site, *i.e.*, a site which presents a significant threat to the public health or environment and which requires action, pursuant to ECL § 27-1305(4)(b).

54. DEC unsuccessfully attempted to obtain the agreement of defendants Sheldon Schiff and West Side to investigate and clean up contamination at the Site.

55. To remedy the actual and threatened release of hazardous substances into the environment from the Site, the State has taken response actions at the Site, within the meaning of § 101(25) of CERCLA, 42 U.S.C. § 9601(25), in accordance with the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300 (the "National Contingency Plan").

56. After listing the Site as a Class 2 site, NYSDEC separated the Site into three operable units to determine the nature and extent of contamination at the Site. Operable Unit No. 1 ("OU-1") consists of soil and groundwater contamination on the site property alone. Operable Unit No. 2 ("OU-2") includes areas where contaminated groundwater has migrated off-site. Operable Unit No. 3 ("OU-3") consists of soil vapor intrusion studies and mitigation of off-site structures that are impacted and potentially impacted by contaminated groundwater plumes.

**OU-1**

57. Between February and October 1999, DEC conducted the Remedial Investigation ("RI") for OU-1 to investigate on-site contamination, primarily associated with the use and spillage of PCE from the former ASTs and potential former PCE storage areas located at the Site.

58. Volatile organic compounds ("VOCs"), including PCE and its degradation compounds trichloroethene ("TCE"), 1,2-dichloroethene ("1,2-DCE") and vinyl chloride, were detected in the soils and in the groundwater throughout the limits of the Site property lines (with the exception of the northwest boundary).

59. The RI report identified three areas as the source of the PCE contamination which were designated as Source Area 1, Source Area 2 and Source Area 3. Source Area 1, the most significant area of contamination, is located near the center of the Site, the area associated with former ASTs, underground piping, and under the southeast corner of the building. Source Area 2 is located near the northeastern property boundary. Source Area 3 is located near the western exterior portion of the Site building. In all three areas PCE concentrations far above DEC's soil cleanup guidelines were detected.

60. The results of the on-site RI also indicated that the migration of contaminated on-site groundwater has impacted off-site areas. DEC then conducted an off-site RI to assess the nature and extent of off-site PCE contamination.

61. In July 2000, DEC adopted a Record of Decision ("ROD") for OU-1 selecting a remedy which required, *inter alia*, removal and treatment of the contaminated soil and groundwater and a long-term monitoring program to evaluate the effectiveness of the remedy.

62. During the fall and winter of 2001, a pilot-scale study was performed in Source Area 1 by DEC's consultant as part of the remedial design. Based on the pilot study, DEC selected a different technology, electrical resistive heating ("ERH"). In September 2002, an Explanation of Significant Differences was issued by the Department revising the OU-1 remedy for Source Area 1 to incorporate the ERH technology.

63. Design of the OU-1 remedy was completed in June 2004. Construction of the ERH and soil vapor extraction ("SVE") treatment systems began in December 2004 and was completed in December 2005.

64. SVE treatment system operations began in Source Areas 2 and 3 in July 2006 and currently continue.

**OU-2**

64. DEC performed the off-Site RI from May 2000 through August 2000 for areas in the vicinity of the Site, referred to as OU-2. The off-site study area surrounds the Site to the north, east and south and is identified in the off-Site RI as the Upgradient Study Area, the Eastern Study Area, and the Downgradient Study Area.

65. PCE in groundwater exceeded the state groundwater standards over much of the Downgradient Study Area. TCE, 1,2-DCE, and vinyl chloride were also identified at levels exceeding groundwater standards in both shallow and deep groundwater.

66. In February 2002, DEC adopted a ROD for OU-2 selecting a remedy which requires the removal and treatment of contaminated groundwater that includes the installation of a high-capacity extraction well on property owned by NYCDEP. The remedy also requires modification of the on-Site treatment system for OU-1 as necessary.

67. In order to advance the remedial program for OU-2, in September 2007 the DEC entered into a State Assistance Contract with the City of New York (the "City"), and the City agreed to design, construct, and manage the treatment system start-up and implement the remedy selected by DEC.

68. DEC agreed to reimburse the City for its actual engineering and construction

11

costs of implementing the OU-2 remedy in an amount not to exceed $6.5 million and also agreed to assume full responsibility for site management including operation, maintenance, and monitoring of the completed OU-1 and OU-2 remedies.

69. NYCDEP has completed the remedial design of the OU2 remedy on property owned by NYCDEP. Construction is scheduled to begin in March 2008, after NYCDEP completes the bidding process and hires a contractor.

**OU-3**

70. Beginning in 2005, DEC conducted additional groundwater and soil gas vapor intrusion investigations within the downgradient contaminated groundwater plume to determine the extent to which VOCs may have migrated from the groundwater as a vapor into the indoor air of overlying structures. Numerous vapor probes were installed into the ground along roads and in residential lawns south of the Site to define the areas where soil vapor intrusion may be occurring. DEC also collected soil vapor samples from beneath home slabs and indoor air samples from individual homes. Groundwater, soil, air and in-home sampling investigations are continuing in addition to the installation of mitigation systems and other corrective measures.

71. The State has incurred response costs, not including interest and enforcement costs, of over 6 million dollars to date in responding to the release and threatened release of hazardous substances at the Site.

72. The release of hazardous substances and other chemicals into the environment has caused injury to, destruction or loss of the State's natural resources, within the meaning of §§ 101(16) and 107(a)(4)(C) of CERCLA, 42 U.S.C. §§ 9601(16) and 9607(a)(4)(C). The State has suffered and will continue to suffer, damages for injury and loss, including the

12

reasonable cost of assessing such damages.

### FIRST CAUSE OF ACTION
### CERCLA

73. The Site is a facility within the meaning of CERCLA § 101(9), 42 U.S.C. § 9601(9).

74. On information and belief, defendant West Side is the current owner of the facility within the meaning of CERCLA §§ 107(a)(1) and 101(20)(A), 42 U.S.C. §§ 9607(a)(1) and 9601(20)(A).

75. On information and belief, defendant West Side was an owner and operator of the Site at the time of the disposal of hazardous substances there within the meaning of CERCLA §§ 107(a)(2) and 101(20)(A), 42 U.S.C. §§ 9607(a)(2) and 9601(20)(A).

76. On information and belief, defendant Schiff was an operator of the Site at the time of the disposal of hazardous substances there within the meaning of CERCLA §§ 107(a)(2) and 101(20)(A), 42 U.S.C. §§ 9607(a)(2) and 9601(20)(A).

77. PPG arranged for disposal at the Site of hazardous substances within the meaning of § 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

78. Dow arranged for disposal at the Site of hazardous substances within the meaning of § 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

79. Ethyl arranged for disposal at the Site of hazardous substances within the meaning of § 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

80. "Hazardous substances," as defined by CERCLA § 101(14), 42 U.S.C.

§ 9601(14), have been released into the environment at and from the Site within the meaning of the word "release" as defined in CERCLA § 101(22), 42 U.S.C. § 9601(22).

81. The release of hazardous substances from the Site has caused and is causing contamination of the environment, including soil and groundwater on and around the Site and off-Site.

82. The release or threatened release of hazardous substances from the Site into the environment has caused the State to undertake response actions, within the meaning of CERCLA §101(25), 42 U.S.C. § 9601(25), in accordance with the National Contingency Plan.

83. The release or threatened release of hazardous substances from the Site into the environment has caused the State to incur response costs, within the meaning of CERCLA §§ 101(25) and 107, 42 U.S.C. §§ 9601(25) and 9607, and continues and will continue to cause the State to incur response costs in the future.

84. The Defendants are strictly, jointly and severally liable under § 107(a)(4)(A) of CERCLA, 42 U.S.C. § 9607(a)(4)(A), for the past, present, and future response costs incurred and to be incurred by the State in responding to releases of hazardous substances at the Site.

85. The release of hazardous substances from the Site into the environment has caused and is causing injury to, destruction of and/or loss of the natural resources of the State, within the meaning of CERCLA §§101(16) and 107(a), 42 U.S.C. §§ 9601(16) and 9607(a).

86. The Defendants are strictly, jointly and severally liable under § 107(a)(4)(C) of CERCLA, 42 U.S.C. § 9607(a)(4)(C), to the State for all damages or injury to, destruction, or loss of the natural resources of the State at and near the Site, and for all reasonable costs of assessing such injury, destruction or loss resulting from the disposal and release of hazardous

substances at the Site.

## SECOND CAUSE OF ACTION
### Public Nuisance

87. Because hazardous substances have been released into the environment at the Site and conditions at the Site constitute a continuing and substantial threat to public health and the environment, conditions at the Site constitute a public nuisance.

86. Defendants created or contributed to the creation of a public nuisance at the Site.

89. Defendants have maintained a public nuisance at the Site.

90. Defendants have failed and continue to fail to abate the public nuisance at the Site.

91. As a result of the public nuisance described herein, the State has expended and will in the future expend large sums of money for abatement of the nuisance.

92. Defendants are jointly and severally liable to the State under the common law of public nuisance of the State of New York and New York Real Property and Proceedings Law § 841 for the public nuisance described herein and for all costs of the State to abate such public nuisance.

## THIRD CAUSE OF ACTION
### Restitution

93. By virtue of the facts stated above, Defendants have had a duty to abate the public nuisance that exists at the Site and remediate the contamination.

94. Defendants have failed to do so.

95. The State has discharged and will continue to discharge defendants' duty to abate this nuisance.

96. By discharging their duty to abate the nuisance, the State has conferred a benefit upon defendants.

97. Defendants are being unjustly enriched by virtue of the conferral by the State of this benefit upon them.

98. Defendants are liable to the State in restitution for the value of the benefit conferred by the State.

## FOURTH CAUSE OF ACTION
### Indemnification

99. The Defendants currently have, and previously had, an obligation to the State and the public at large to investigate and remediate the release or the threatened release of hazardous substances at and from the Site. Such obligation includes the duty to conduct necessary environmental studies, to eliminate the release or the threatened release of hazardous substances, and to monitor at and near the Site and in and around the Jamaica water supply wells to ensure that corrective measures are adequate to protect the public health and the environment.

100. The Defendants did not investigate, design or implement the remedy for the on-site soils and groundwater contamination migrating off-site to the Jamaica public water supply wells, nor have they investigated the Site, with limited exceptions, or off-site in and around the Jamaica public water supply wells.

101. The State has performed and will in the future perform duties and obligations owed by the Defendants to investigate, remediate and monitor the Site and off-site in and around the Jamaica public water supply wells.

102. The actions taken and costs incurred by the State were necessary to ensure the health, safety and welfare of the public and to protect the environment of the State.

103. The Defendants are liable to the State for the indemnification of all expenses and costs incurred by the State in performing the Defendants' duties and obligations at the Site and off-site in and around the Jamaica water supply wells, including but not limited to the cost of investigation, remediation, monitoring, oversight, enforcement, and interest.

### FIFTH CAUSE OF ACTION
### Damages to the Natural Resources
### Of the State of New York under CERCLA

104. As a current owner of the Site, defendant West Side is jointly, severally, and strictly liable under § 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), to the State for all damages or injury to, destruction, or loss of the natural resources of the State, and for all reasonable costs of assessing such injury, destruction or loss resulting from the disposal and release of hazardous substances at the Site.

105. As an owner and operator of the facility at the time of the disposal of hazardous substances there, defendant West Side is jointly, severally, and strictly liable under § 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), to the State for all damages or injury to, destruction, or loss of the natural resources of the State, and for all reasonable costs of assessing such injury, destruction or loss resulting from the disposal and release of hazardous substances at the Site..

106. As an operator of the Site at the time of the disposal of hazardous substances there, defendant Schiff is jointly, severally, and strictly liable under § 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), to the State for all damages or injury to, destruction, or loss of

injury to, destruction, or loss of the natural resources of the State, and for all reasonable costs of assessing such injury, destruction or loss resulting from the disposal and release of hazardous substances at the Site;

7. Directing defendants, pursuant to the common law of the State of New York, to pay the State damages for injury to, destruction, or loss of the natural resources of the State, and for all reasonable costs of assessing such injury, destruction or loss resulting from the disposal and release of hazardous substances at the Site; and

8. Ordering payment of enforcement costs, interest, and such other and further relief as is just and proper.

Dated: New York, New York
October 10, 2007

ANDREW M. CUOMO
Attorney General of the State
of New York
Attorney for Plaintiffs

By: _____
JEANNA E. HUSSEY JH-8737
Assistant Attorney General
New York State Department of Law
Environmental Protection Bureau
120 Broadway, 26th Fl.
New York, New York 10271
(212) 416-8455

Of Counsel:

Deborah Christian, Esq.
Division of Environmental Enforcement
New York State Department of
Environmental Conservation
625 Broadway
Albany, New York