**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
THE STATE OF NEW YORK and ALEXANDER B. :
GRANNIS, as COMMISSIONER OF NEW YORK :
STATE DEPARTMENT OF ENVIRONMENTAL :
CONSERVATION, :

                                     Plaintiffs, :

             -against- :

             :
WEST SIDE CORP., SHELDON F. SCHIFF, DOW :
CHEMICAL COMPANY, ETHYL CORPORATION :
and PPG INDUSTRIES, INC., :

                           Defendants. :
------------------------------------------------------------------x

<u>**MEMORANDUM & ORDER**</u>

07-CV-4231 (ENV) (ALC)

**VITALIANO, D.J.**

      Plaintiffs, the State of New York and Alexander B. Grannis, in his then capacity as the

Commissioner of the New York State Department of Environmental Conservation ("DEC"),

filed this action against defendants, West Side Corp. ("West Side"), Sheldon F. Schiff, Dow

Chemical Company ("Dow"), Ethyl Corporation ("Ethyl") and PPG Industries, Inc. ("PPG"),

alleging liability under the Comprehensive Environmental Response, Compensation and

Liability Act ("CERCLA" or "the Act"), 42 U.S.C. §§ 9601 et seq, and New York's common

law doctrines of public nuisance, restitution, and indemnification. This litigation involves costs

incurred by the state in responding to hazardous substances released at or from a facility known

as the West Side Corporation site, a storage distribution center for perchlorethylene ("PCE").

Dow, Ethyl, and PPG (collectively the "manufacturer defendants") are all manufacturers and

distributors of PCE and contracted with West Side to supply it with PCE. The manufacturer

defendants now move to dismiss counts two, three, four and six of the complaint pursuant to

Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, defendants' motion is

1

granted in part and denied in part.

# I.    BACKGROUND

The following factual allegations are drawn from the complaint and are considered true for purposes of the current motion.

West Side is a New York corporation with its principal place of business at the West Side Corporation site, 107-10 180th Street, Jamaica, New York ("the site"). (Compl. ¶ 10.) West Side currently owns the site and operated a storage distribution center there from 1969 to 1990 for PCE, a chemical commonly used in the dry cleaning industry. (Id. ¶ 10.) Dow, Ethyl, and PPG contracted with West Side to supply it with PCE for redistribution or repackaging. (Id. ¶¶ 14, 26, 38.)

The process of delivering PCE to West Side was allegedly the same for each of the manufacturer defendants. PCE arrived on railroad tankers and was then directly transferred by the manufacturers to West Side's aboveground storage tanks ("AST") located on the southeast portion of the site. (Id. ¶¶ 16, 27-28, 39-40.) Since the ASTs had no spill prevention restraints, spills and leaks would "necessarily," and did, occur during these transfers. (Id. ¶¶ 17-18, 29-30, 41-42.) Spills and leaks also occurred during the transfer of PCE from the ASTs to the site building via underground pipes. (Id. ¶¶ 20, 32, 44.) Plaintiffs allege that the manufacturer defendants had control over and knowledge of the spills and leaks for the duration of their working relationship with West Side. (Id. ¶¶ 21-24, 33-36, 45-48.)

The site is located adjacent to four drinking water supply wells that are, and for some time have been, decommissioned by the New York City Department of Environmental Protection ("DEP") due to groundwater contamination. (Id. ¶ 50.) In August 1997, after a subsurface investigation conducted by a private environmental consultant, EEA Inc., DEC

designated the site an "inactive hazardous waste disposal Site," as defined under New York law. (Id. ¶¶ 52-53.) DEC attempted to, but could not, obtain West Side's or Schiff's agreement to investigate the contamination and clean up the site. (Id. ¶ 54.) Disagreement was not the final word. Instead, the state pursued "response actions at the Site, within the meaning of § 101(25) of CERCLA, 42 U.S.C. § 9601(25), in accordance with the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300" ("NCP"). (Id. ¶ 55.) The state claims that it incurred response costs of over $6 million as of the date of the complaint, October 10, 2007. (Id. ¶ 71.)

That complaint alleges six causes of action. First, plaintiffs claim that defendants are jointly and severally liable for all response costs incurred by the state to date, and all costs to be incurred in the future, pursuant to 42 U.S.C § 9607 ("CERCLA § 107"). (Id. ¶ 84.) The second cause of action asserts that defendants are jointly and severally liable for all costs incurred by the state to abate the public nuisance caused by the hazardous substances released into the environment. (Id. ¶¶ 87-92.) Third, plaintiffs charge that defendants have been unjustly enriched by the state and are liable for the value of the benefit conferred. (Id. ¶¶ 93-98.) The fourth cause of action sounds in indemnification; plaintiffs seek all the expenses and costs incurred while performing defendants' duties. (Id. ¶¶ 99-103.) Fifth, plaintiffs allege that defendants are jointly and severally liable to the state for "all damages or injury to, destruction, or loss of the natural resources of the State at and near the Site, and for all reasonable costs of assessing such injury," under CERCLA § 107. (Id. ¶¶ 86, 104-109.) In the sixth cause of action, plaintiffs contend that defendants are jointly and severally liable for all damages to the natural resources of the state pursuant to the common law doctrine of public nuisance and statutorily under New York Real Property and Proceedings Law § 841. (Id. ¶ 110.) The manufacturer

defendants now move to dismiss only the state law claims—counts two, three, four and six of the complaint.

## II. DISCUSSION

### A. Analytical Framework for Threshold Dismissal

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." This rule does not compel a litigant to supply "detailed factual allegations" in support of his claims, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964 (2007), "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "A pleading that offers 'labels and conclusions' . . . will not do." Id. (quoting Twombly, 550 U.S. at 555); see also In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 557).

To survive a Rule 12(b) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. This "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (internal quotations omitted); see Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (interpreting Twombly to require a "plausibility standard" that "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible"), rev'd on other grounds, 129 S. Ct. 1937 (2009). A court must presume the truth of all factual allegations in the complaint for purposes of Rule 12(b)(6), but the court is not bound to accept the truth of legal conclusions couched as factual allegations. Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 2944 (1986). Indeed,

4

it is the factual allegations that are paramount, as "a complaint need not pin plaintiff's claim for relief to a precise legal theory," nor does it need to provide "an exposition of his legal argument." Skinner v. Switzer, 562 U.S. ___, 131 S. Ct. 1289, 1296 (2011).

In analyzing well-pled facts at this stage, a court will draw all reasonable inferences in favor of the nonmoving party. See Gorman v. Consol. Edison Corp., 488 F.3d 586, 591-92 (2d Cir. 2007). Additionally, on a motion to dismiss unrelated to subject matter jurisdiction, the court may only consider the pleading itself, documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, and matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995).

## B. Federal Preemption

Defendants argue that plaintiffs' state law claims for public nuisance, restitution, and indemnification are all preempted by federal law as they "impermissibly conflict" with the CERCLA causes of action. Plaintiffs, of course, retort sharply, arguing that Congress, in enacting CERCLA, expressly preserved state law remedies regarding hazardous waste sites.

As is now well-engrained, the Supremacy Clause of Article VI of the Constitution grants Congress the authority to preempt state law. La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 368, 106 S. Ct. 1890, 1898 (1986). As a result, "state laws that conflict with federal law are 'without effect.'" Altria Group, Inc. v. Good, 555 U.S. 70, 70, 129 S. Ct. 538, 543 (2008) (quoting Maryland v. Louisiana, 451 U.S. 725, 746, 101 S. Ct. 2114, 2129 (1981)). Simply put, "[p]re-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law." La. Pub. Serv. Comm'n, 476 U.S. at 368 (citing Jones v. Rath Packing Co., 430 U.S.

5

519, 97 S. Ct. 1305 (1977)). "[T]he purpose of Congress is the ultimate touchstone in every preemption case." Wyeth v. Levine, 555 U.S. 555, 555, 129 S. Ct. 1187, 1194 (2009) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S. Ct. 2240, 2250 (1996))

There are three ways in which federal law may preempt state law: express preemption, implied or field preemption, and conflict preemption. Express preemption exists where Congress declares in express terms "its intention to preclude state regulation in a given area." Bedford Affiliates v. Sills, 156 F.3d 416, 426 (2d Cir. 1998) (citing Jones, 430 U.S. at 525, 97 S. Ct. at 1309), overruled on other grounds by W.R. Grace & Co. v. Zotos Int'l, Inc., 559 F.3d 85 (2d. Cir. 2009). "When a federal law contains an express preemption clause, [the] 'focus [is] on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.'" Chamber of Commerce of the United States v. Whiting, 563 U.S. ____ (2011) (quoting CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664, 113 S. Ct. 1732, 1737 (1993)). On the other hand, implied or field preemption exists where "federal law is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation." Bedford Affiliates, 156 F.3d at 426 (quoting Hillsborough Cnty. v. Automated Med. Lab., Inc., 471 U.S. 707, 713, 105 S. Ct. 2371, 2375 (1985)) (internal quotation marks omitted). Finally, under conflict preemption, "a state law may be preempted to the extent that it actually conflicts with a valid federal statute." Id. (quoting Ray v. Atl. Richfield Co., 435 U.S. 151, 158, 98 S. Ct. 988, 994 (1978)) (internal quotation marks omitted). Conflict preemption can occur either "when compliance with both federal and state regulations is a physical impossibility," id. (quoting Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S. Ct. 1210, 1217 (1963)) (internal quotation marks omitted), or "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

6

Congress." Id. (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S. Ct. 399, 404 (1941)) (internal quotation marks omitted).

"CERCLA is a comprehensive federal law governing the remediation of sites contaminated with pollutants." Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc., 423 F.3d 90, 94 (2d Cir. 2005). It is "remedial in nature," Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 120 (2d Cir. 2010), having been enacted in 1980 "in response to the serious environmental and health risks posed by industrial pollution." Burlington N. & Santa Fe Ry. Co. v. United States, 129 S. Ct. 1870, 1874 (2009) (citing United States v. Bestfoods, 524 U.S. 51, 55, 118 S. Ct. 1876, 1881 (1998)). The Act was primarily designed to "encourag[e] the timely cleanup of hazardous waste sites and plac[e] the cost of that cleanup on those responsible for creating or maintaining the hazardous condition." Consol. Edison Co. of N.Y., 423 F.3d at 94 (internal quotation marks and citations omitted). In that vein, "CERCLA empowers the federal government and the states to initiate comprehensive cleanups and to seek recovery of expenses associated with those cleanups." Niagara Mohawk Power Corp., 596 F.3d at 120. Congress envisioned a scheme under which "taxpayers [would] not [be] required to shoulder the financial burden of a nationwide cleanup." B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1198 (2d Cir. 1992) (internal citations omitted).

CERCLA provides two related but distinct legal avenues by which a party can recoup some or all of the costs associated with an environmental cleanup: a cost recovery action under § 107(a) and a contribution action under § 113(f). Section 107 permits government agencies and certain private parties "to seek reimbursement for all removal or remedial costs associated with the hazardous materials on the property." Niagara Mohawk Power Corp., 596 F.3d at 121. At the other end of the spectrum, § 113 provides potentially responsible parties ("PRP") with two

means of obtaining contribution. Id. First, under § 113(f)(1), PRPs who have been sued under § 107 may seek contribution from other PRPs. Id. Second, under § 113(f)(3)(B), PRPs who have "settled their CERCLA liability with a state or the United States through either an administrative or judicially approved settlement" may also seek contribution. Id. In short, while § 107 "is available for parties that have incurred actual response costs," § 113(f) "is available for parties that have reimbursed those response costs to others." Id. at 122 (citing United States v. Atl. Research Corp., 551 U.S. 128, 139, 127 S. Ct. 2331, 2338-39 (2007)).

In enacting CERCLA, Congress specifically addressed the issue of federal preemption:

> Nothing in this Act shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State.

But the Act also goes on to state that:

> Any person who receives compensation for removal costs or damages or claims pursuant to this Act shall be precluded from recovering compensation for the same removal costs or damages or claims pursuant to any other State or Federal law. Any person who receives compensation for removal costs or damages or claims pursuant to any other Federal or State law shall be precluded from receiving compensation for the same removal costs or damages or claims as provided in this Act.

CERCLA § 114(a), (b), 42 U.S.C. §9614(a), (b). Following suit, the Second Circuit has held that CERCLA does not expressly preempt all state law claims, but does bar double recovery for the same injuries. Bedford, 156 F.3d at 426 ("We have ruled that CERCLA as a whole does not expressly preempt state law, but simply prohibits states from 'recovering compensation for the same removal costs or damages or claims' under both CERCLA and state or other federal laws, and prohibits states from requiring contributions to any fund 'the purpose of which is to pay compensation for claims which may be compensated under' CERCLA.") (quoting New York v.

8

Shore Realty Corp., 759 F.2d 1032, 1041 (2d Cir. 1985)).

Given its watershed importance, both parties rely on Bedford, arriving, of course, at diametrically opposed conclusions. Bedford involved a property owner who commenced suit under CERCLA to recover remediation costs from the tenants in possession of the property. Bedford, 156 F.3d at 420. As fee owner, Bedford incurred all the cleanup costs for soil contamination caused by tetrachloroethylene, yet another dry cleaning chemical. Id. As a preliminary matter—and critical to the current case—the court determined that Bedford's claim for remediation costs was not available under CERCLA § 107(a) because Bedford was a PRP under the statute.[1] Id. at 423-24. It thus concluded that the only federal cause of action the plaintiff was eligible to pursue was one for contribution under CERCLA § 113(f). Id. at 425.

Analyzing the preemption issue, the court considered the repeal of § 114(c) and the accompanying Senate report, which stated that:

> The reported bill strikes section 114(c) of the Act to clarify that States are not preempted from imposing taxes for purposes already covered by CERCLA. . . . The primary effect of the amendment will be to remove a potential barrier to the creation of State superfund programs.

Id. at 426 (quoting S. Rep. No. 99-11 at 59-60 (1985)). The court ultimately concluded that CERCLA does not entirely preempt state law, finding that "it was not part of the legislative purpose that CERCLA be a comprehensive regulatory scheme occupying the entire field of hazardous wastes, nor does CERCLA prevent the states from enacting laws to supplement federal measures relating to the cleanup of such wastes." Id. at 426-27. This green light holding was, nonetheless, still subject to CERCLA's statutory language barring double recovery. See id.

---

[1] This aspect of the holding has since been overruled. See Atl. Research Corp., 551 U.S. at 141, 127 S. Ct. at 2339.

at 426.

Directly addressing conflict preemption, the Circuit carefully considered the potential collision between CERCLA's finely tuned contribution scheme under § 113(f), and the state law remedies of restitution and indemnification. Id. at 427. It determined that Congress's objective was to aid in the "expeditious resolution of environmental claims" by giving "incentives for potentially responsible parties to settle [with the government] and strong disincentives for non-settling potentially responsible parties." Id. PRPs who settle their liability with the government "gain protection from contribution, enjoy potentially favorable settlement terms, and retain the ability to seek contribution from other defendants." Id.; see also CERCLA § 113(f), 42 U.S.C. § 9613(f). Alternatively, PRPs who choose not to settle their CERCLA liability with the government "are barred from seeking contribution from the settling parties and thereby face potentially disproportionate liability." Bedford, 156 F.3d at 427 (citing In re Reading Co., 115 F.3d 1111, 1119 (3d Cir. 1997)); see also CERCLA § 113(f), 42 U.S.C. § 9313(f). The court concluded that state law restitution and indemnification actions "would bypass this carefully crafted settlement system, creating an actual conflict [] between CERCLA and state common law causes of action." Bedford, 156 F.3d at 427. It therefore held that the restitution and indemnification claims could not survive on conflict preemption grounds. Id. at 426. It is upon this holding that defendants primarily rely, positing that state law indemnification and restitution claims are generally preempted because they could lead to double recovery, which would impermissibly conflict with CERCLA.

Still, Bedford does not resolve all issues and bar all doors; it stands for a much narrower proposition. First, the *ratio* for preemption in Bedford in no way relied on the sin of double recovery. Instead, the court found a conflict between the state law causes of action and the right

to contribution under § 113(f) as a matter of federal statute. Id. In fact, it is clear that, given § 114, preemption driven by the sin of double recovery is a form of express preemption -- the specific and express mandate of Congress. Bedford, on the other hand, turned on conflict preemption. Defendants' interpretation of Bedford conflates the double recovery bar established by CERCLA §114 with Bedford's holding that state restitution and indemnification claims would impermissibly conflict with the settlement provisions in CERCLA §113. Id. But, regardless, the Bedford holdings and the squabble over them are not apposite on this motion since the dispute here does not arise under CERCLA §113. Rather, the battleground is CERCLA §107. Instead of a nonsettling PRP seeking to recover costs under § 113(f) from other PRP settlers, the state here seeks full recovery under § 107 from nonsettling PRPs who, at least at this stage in the litigation, are not entitled to contribution under § 113.[2] The concern that fueled Bedford was the possibility that, after settling their liability with the government, PRPs could later be subject to disproportionate liability inconsistent with the settlement provisions of CERCLA if state law indemnification and restitution actions were allowed to continue. In a CERCLA §107 action like this one though, the state is bringing a cost recovery action against private PRPs. The state itself is not a PRP. Bedford's reach in such situations, therefore, is either diminished or outright neutralized.

In the last analysis, the preemption issue currently before the Court pivots on two questions: the first is whether conflict preemption applies when there is no pending action under CERCLA §113 and, the other, is whether the mere potential for double recovery is enough to trigger the preemption bar.

---

[2] Although not the subject of the instant motion, West Side has answered and cross-claimed against the manufacturer defendants for any recovery ultimately obtained by plaintiffs. To the extent West Side seeks contribution pursuant to CERCLA § 113 and state common law causes of action, the preemption analysis would begin at a decidedly different place.

11

## 1. Conflict with Congress's Goals under CERCLA

Clear from the prologue, two divergent interpretations have emerged regarding the scope of Bedford. Defendants lash themselves to the line of cases that apply CERCLA preemption broadly. However, and critically, these cases all involve private entities bringing § 113 contribution claims against other PRPs. See Niagara Mohawk Power Corp., 596 F.3d 112, 139 (2d Cir. 2010) (holding that state law indemnification and restitution claims are preempted by CERCLA because they would circumvent the settlement scheme under CERCLA § 113(f)); In re Duplan Corp., 212 F.3d 144, 150 n. 7 (2d Cir. 2000) (noting that Bedford stands for the proposition that restitution and indemnification are preempted by CERCLA); DVL, Inc. v. GE Co., No. 07-CV-1075, 2010 U.S. Dist. LEXIS 128810, at *42-43 (N.D.N.Y. Dec. 6, 2010) (relying on Bedford to dismiss state law claims on preemption grounds at the summary judgment phase, given that recovery would be entirely duplicative.); Chitayat v. Vanderbilt Assocs., 702 F. Supp. 2d 69, 78, 82 (E.D.N.Y. 2010) (holding in a contribution action under § 113 that under Niagara Mohawk and Bedford the state restitution and indemnification claims were preempted at summary judgment stage); New York v. Next Millennium Realty, LLC, No. 03-CV-5985, 2008 WL 1958002, at *9-10 (E.D.N.Y. May 2, 2008) [hereinafter Next Millennium II] (holding on a motion to dismiss that state law cross-claims between the potentially responsible defendants premised solely on CERCLA § 113 liability were preempted; Volunteers of Am. of W. N.Y., 90 F. Supp. 2d 252, 257-58 (W.D.N.Y. 2000) (finding state law claims preempted to the extent they alleged the same damages under CERCLA §§ 107 and 113 but allowing them to proceed on the ground that they may recover for different damages).

The second interpretation of Bedford—which is more applicable here—is that in actions where the state is seeking cost recovery under CERCLA § 107, the state law remedies of

restitution and indemnification are not preempted because the potential conflict between the state remedies and the settlement framework under CERCLA § 113 is not implicated. See New York v. Hickey's Carting, Inc., 380 F. Supp. 2d 108, 113-14 (E.D.N.Y. 2005) ("In the absence of any true danger that allowing the State to bring its common law claims for indemnity and restitution alongside its CERCLA cost recovery action will undermine the settlement incentives set forth in section 113, Bedford's holding does not apply to preempt Plaintiff's common law claims on the basis of conflict preemption principles."); See also Next Millennium II, 2008 WL 1958002, at *9-10 (relying on Hickey's Carting to deny defendant's motion to dismiss the state law claims premised on CERCLA § 107 liability.); New York v. Ametek, Inc., 473 F. Supp. 2d 432, 433-35 (S.D.N.Y. 2007) (same); New York v. Next Millennium Realty, LLC, No. 03-CV-5985, 2007 WL 2362144, at *8-11 (E.D.N.Y. Aug. 14, 2007) [hereinafter Next Millennium I] (same).

Following the second line of cases, the Court finds that conflict preemption does not apply when there is no contribution action under CERCLA § 113. Given the parameters of the litigation as filed, it is hard to fathom, as the manufacturer defendants proffer, that the state's common law claims conflict with CERCLA. Unlike the Bedford plaintiff, here, the state brings a cost recovery action under CERCLA §107. In this context, state law indemnification and restitution claims simply do not impermissibly conflict with the statutory settlement provisions of CERCLA. Indeed,

> [i]t is difficult to see how such a [Bedford] scenario would play out in the context of a cost recovery action by the State under section 107, where there can be no similar fear that once the government has reached a settlement with a potentially responsible party, it will then turn around and bring common law claims against the exact same party, as such settlements are intended to resolve a potentially responsible party's liability to the *government* and generally contain releases and covenants not to sue for costs arising out of the same hazardous cleanup.

Hickey's Carting, 380 F. Supp. 2d at 113 (emphasis added). Furthermore, as noted previously, the two underlying purposes of the CERCLA provisions are to ensure rapid cleanup of contamination and the encouragement of private parties to settle their liability with the government. See Bedford, 156 F.3d at 427-28. Permitting plaintiffs to proceed on the state law claims helps accomplish both goals. Plainly, if public entities have multiple avenues to recover the cleanup costs they have incurred, this will create greater incentives for them to undertake cleanup operations. Moreover, responsible defendants will, in turn, be incentivized to settle their obligations with the government entity in order to be afforded the CERCLA § 113 protections against other potentially responsible parties who may eventually seek contribution from them.[3] For instance, here, if Westside and Schiff were to settle their liability with the state, they could

---

[3] While discussing the possibility for PRPs to recover under § 107, the Supreme Court addressed the concern that such an interpretation would stand as an obstacle to the goals of encouraging settlement under § 113. See Atl. Research Corp., 551 U.S. at 140-41, 127 S. Ct. at 2339. The Court explicitly concluded that such interpretation would not discourage settlement:

> [P]ermitting PRPs to seek recovery under § 107(a) will not eviscerate the settlement bar set forth in § 113(f)(2). That provision prohibits § 113(f) contribution claims against "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement . . . ." 42 U.S.C. § 9613(f)(2). The settlement bar does not by its terms protect against cost-recovery liability under § 107(a). For several reasons, we doubt this supposed loophole would discourage settlement. First, as stated above, a defendant [potentially responsible party] may trigger equitable apportionment by filing a § 113(f) counterclaim. A district court applying traditional rules of equity would undoubtedly consider any prior settlement as part of the liability calculus. . . . Second, the settlement bar continues to provide significant protection from contribution suits by [potentially responsible parties] that have inequitably reimbursed the costs incurred by another party. Third, settlement carries the inherent benefit of finally resolving liability as to the United States or a State.

Id.

subsequently seek contribution, but would be statutorily immune from contribution actions themselves. See CERCLA § 113(f), 42 U.S.C. § 9613(f). Therefore, there being no concerns of an actual conflict with CERCLA § 113, plaintiffs' state law claims are not preempted, so the argument goes.

Defendants rely on New York v. Moulds Holding Corp., 196 F. Supp. 2d 210, 219 (N.D.N.Y. 2002), a lone wolf in this circuit, for the opposite proposition. Moulds was decided on cross motions for summary judgment. The court, in the end, allowed the state's §107 cost recovery action to continue while dismissing its restitution and indemnification claims. See id. at 214, 219-20. However, the sole basis for the court's decision was a factual finding that allowing the state to proceed on its restitution and indemnification claims would expressly conflict with CERCLA's double recovery bar. Id. at 219-20. Conflict preemption, as opposed to express preemption, was not a consideration, much less a deciding factor in the court's decision to dismiss the state law claims. Furthermore, Moulds was decided at the summary judgment stage, following the conclusion of discovery and the development of a record. The court was, unlike on this motion, able to review record evidence to determine whether recovery would in fact be duplicative. Id. But perhaps most critically in assessing the reach of that decision, the Moulds court retreated from even this holding in a later opinion in another case:

> The Court now finds persuasive the state's reasoning that the holding in Bedford Affiliates does not apply to CERCLA section 107 actions, but only to contribution actions under section 113. The inconsistencies between CERCLA and the common law that the Second Circuit found significant in Bedford Affiliates simply are not present in the instant section 107 action.

Hickey's Carting, 380 F. Supp. 2d at 113-14 (quoting Oral Arg. Tr. from New York v. ELG Northeast Alloys Corp., No. 01-CV-1956, 2003 U.S. Dist. LEXIS 16053, at *1 (N.D.N.Y. Aug. 18, 2003)). Thus, *in toto*, defendants' reliance on Moulds to support their argument that the state

law claims in this case should be preempted, is, to say the least, unconvincing.

In their reply papers, defendants also raise concerns about their ability to seek contribution from other PRPs if they are found liable, but only under plaintiffs' state law claims. (Reply Mem. at 3). Specifically, they assert that "if the State were allowed to recover these damages under its common law claims, the Manufacturer Defendants' [sic] would have no ability under CERCLA to seek contribution from others." (Id.) Defendants are certainly correct that CERCLA's § 113 contribution scheme is only implicated if the party bringing such an action has resolved its liability under ***CERCLA*** -- either by settlement with a federal or state agency or by a finding of liability in a cost-recovery action under § 107 that concludes in such determination. And their example posits ***no*** CERCLA liability on their part. Therefore, in the logic of their own example, if the manufacturer defendants are ***only*** found liable under the state law causes of action, § 113 would be unavailable anyway -- if the manufacturer defendants did not violate CERCLA, there is no reason they would have a claim for contribution under CERCLA. The state law claims are, by definition, causes of action completely independent of CERCLA. As such, any contribution claim, for example, must be grounded in state not federal law. Obviously too, defendants do not assert, nor will the logic of their hypothetical allow, that any liability under the state law claims interposed in the complaint would otherwise subject them to "disproportionate liability" under CERCLA inconsistent with § 113, see Bedford, 156 F.3d at 427 (citing In re Reading Co., 115 F.3d at 1119), which is necessary to a finding of any sort of preemption.

2. The Double Recovery Bar.

Notwithstanding all else, one point is clear: at the end of the day, plaintiffs are expressly preempted from bringing supplemental claims along with their CERCLA claim if doing so

would permit them to recover the same removal costs under both CERCLA and other state or federal laws. See CERCLA § 114(b), 42 U.S.C. § 9614(b); see also Bedford, 156 F.3d at 426. Some courts in this circuit have considered this "double recovery bar" to be a complete bar to supplemental state law claims right at the courthouse door unless the plaintiff has at least pled that the damages sought under state law will be unavailable under CERCLA. See Volunteers of Am. of W. N.Y., 90 F. Supp. 2d at 258 (denying defendant's motion to dismiss state law claims, the court held that "CERCLA does not completely preempt plaintiff's state law claims to the extent those claims seek damages which are not available under CERCLA."); cf. Moulds, 196 F. Supp. 2d at 219 (finding on summary judgment that the state's claims for indemnification and restitution sought only damages that were available under CERCLA). On the other hand, some courts have been more lenient in permitting embryonic state law claims to proceed where there has been "no recovery to be duplicated and there remains the potential that [p]laintiff may not be able to recover all of its costs from each cause of action." See Hickey's Carting, 380 F. Supp. 2d at 115 (denying defendant's motion to dismiss state law claims where there has yet to be any recovery by the plaintiff, and the potential for recovery under CERCLA might be unavailable by failure to comply with the NCP or barred by the statute of limitations); see also Ametek, 473 F. Supp. 2d at 434-35 (The state "is simply asserting that in the event that recovery under CERCLA is not possible, an alternative avenue under state law would be available. This does not run contrary to the intent of Congress, which [] included specific provisions in CERCLA which allow states to impose additional liability.") (citing CERCLA § 114(a), 42 U.S.C. § 9614(a)); Next Millennium II, 2008 WL 1958002, at *10 (same); Next Millennium I, 2007 WL 2362144, at *11 (denying defendant's motion to dismiss state law claims as duplicative where plaintiffs "have represented that it is conceivable that they might recover costs under state law that may

not be recoverable under CERCLA in the event plaintiffs' response costs are determined to be inconsistent with the NCP or if the claims were time-barred.").

So the issue before the Court now is narrow; that is, whether, at the pleading stage, the failure to plead a claim seeking damages distinct from damages available under CERCLA requires repleading or outright dismissal. In a purely analytical context, Rule 12 survival is most tenable, it seems, where the state law claims are actually raised in the alternative. Even short of that, however, if plaintiffs fail to make out a prima facie CERCLA claim, for example, by failing to comply with the NCP, then, with a nonviable CERCLA claim, the threat of double recovery would evaporate. Cf. Hickey's Carting, 230 F. Supp. 2d at 114-15 (plaintiff conceded that it could not recover twice for the same response costs, even if the state law claims were to stand). Given the broad range of possibilities, then, it would seem imprudent to dismiss state law claims outright on Rule 12 because of a mere **_potential_** for double recovery. See id. at 115 ("the case for preemption based on the likelihood of double recovery [is] stronger . . . at the summary judgment stage, as opposed to the pleading stage," where neither side has had the opportunity to put forth any evidence showing the state's inability to recover under CERCLA.) And, regardless, sustaining the complaint at threshold would certainly not bar defendants from a renewed attack at a later, more informed and factually developed point in the litigation. See Next Millennium I, 2007 WL 2362144, at *11 ("[D]efendants can reassert their motion at a later stage of the litigation when additional information would be available concerning what costs would be recoverable under each claim.").

Defendants argue that allowing plaintiffs to proceed on the state law claims would circumvent the CERCLA goal of NCP compliance. See (Mot. to Dismiss at 10-11). This argument is unpersuasive. In enacting CERCLA, Congress clearly preserved the authority of

states to impose additional liability regarding the release of hazardous substances. See CERCLA § 114(a), 42 U.S.C. § 9614(a). This was best addressed in Hickey's Carting where the court observed that

> the effect of finding such a conflict [premised on non-compliance with the NCP] would be to preempt all state common law causes of action in the face of a concurrent CERCLA claim, as the common law remedies will never include a requirement that the costs sought were incurred consistent with the NCP. This would be akin to field preemption by CERCLA of state common law claims, which is inconsistent with CERCLA's savings clauses as well as the Second Circuit's holding in Bedford, which specifically stated that Congress did not intend to occupy the field of hazardous waste disposal.

Id. at 116-17 (internal footnotes omitted). Defendants' assertions in their motion papers seem to oddly suggest that permitting plaintiffs to proceed on the state law claims could somehow subject them to CERCLA liability even if the NCP is not complied with. See (Mot. to Dismiss at 10.) Indeed, the cases they cite for this argument deal with the issue of CERCLA recovery absent cleanup consistent with the NCP, (id.), but, again, the manufacturer defendants are traveling in an obverse universe. Clearly, there can be no recovery *under CERCLA* without NCP compliance. See 42 U.S.C. § 9607(4)(a) (expressly stating that liability attaches for "all costs of removal or remedial action incurred by the United States Government or a State ... not inconsistent with the national contingency plan."). This tangent leads nowhere. The imposition of additional hazardous waste contamination liability under state law, on facts that would not, for whatever reason, support CERCLA liability, is expressly authorized by CERCLA. See CERCLA § 114(a), 42 U.S.C. 9614(a).

Next, seeking additional fuel for their fire, defendants cite to certain statements made at the pre-motion conference. Plaintiffs' counsel there stated that the alleged response costs would be the same whether recovery was ultimately permitted under CERCLA or state law doctrines.

(Mot. to Dismiss at 10). This statement, however, is completely irrelevant. Such statements, particularly in the informal setting of a pre-motion conference, are well beyond the bounds of the very limited menu of considerations appropriate on a Rule 12(b)(6) motion. See, e.g., Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991); Sira v. Morton, 380 F.3d 57, 67-68 (2d Cir. 2004); Goldman v. Belden, 754 F.2d 1059, 1066-67 (2d Cir. 1985). Moreover, even if the statement was properly before the Court and binding on plaintiffs, the state law claims would nonetheless survive because, the issue of identical damages aside, there is still the possibility of nonrecovery under CERCLA for either substantive or procedural reasons unrelated to the amount or nature of the damages.

Finally, any concern about double recovery with regard to plaintiffs' public nuisance claim is illusory for, as will be discussed in Part II.C, to the extent monetary damages are sought under a public nuisance theory, such claim is barred by New York's statute of limitations. The limitations period, however, would not be an absolute bar to a public nuisance action seeking injunctive relief. See, e.g., Jensen v. Gen. Elec. Co., 82 N.Y.2d 77, 90-91, 603 N.Y.S.2d 420, 426, N.E.2d 547, 553 (1993) ("Since by its terms the discovery rule of CPLR 214-c (2) applies only to actions for damages and not to injunctive relief, the common-law accrual method is applicable. Therefore, equitable injunctive relief may be available and should be scrutinized under the usual array of considerations for such matters."). Save for actions brought in the name of the United States, CERCLA neither authorizes nor bars injunctive relief otherwise available to state agencies or private litigants. See Shore Realty Corp., 759 F.2d at 1049 ("[W]e . . . are required to hold that injunctive relief under CERCLA is not available to the State."); see also 42 U.S.C. § 9606(a) (expressly granting the power to the President and the Attorney General the right to injunctive relief). The bottom line is, as pled here, the surviving state law public

nuisance cause of action poses absolutely no double recovery threat.

In sum, judged by the Rule 12(b)(6) standard, the Court finds that plaintiffs' state law claims for public nuisance, restitution, and indemnification are not preempted; they do not "impermissibly conflict" with the CERCLA causes of action as they are pled. Since plaintiffs are seeking recovery under CERCLA § 107 as opposed to § 113, the Bedford concerns about inconsistencies between the CERCLA settlement framework and the state common law remedies are not relevant. Similarly, at threshold, double recovery remains merely a threat -- premature at best and not sufficiently developed. Discovery holds the key in such situations. Plainly, recovery under CERCLA might be unavailable altogether. It is simply too soon to determine whether double recovery is a real possibility. Consequently, defendants' motion to dismiss the state law claims on preemption grounds is denied.

## C. Public Nuisance

The next string on defendants' bow is their contention that plaintiffs' second cause of action for public nuisance is time barred by the New York statute of limitations. Of course, it is well-established that a statute of limitations defense may only be resolved on a pre-answer motion to dismiss where the complaint alleges specific information to permit such a finding. See Gharty v. St. John's Queens Hosp., 869 F.2d 160, 162 (2d Cir. 1989).

Public nuisance has evolved over time as a common law cause of action in New York. Historically, the concept of a nuisance abatement basis for government action first surfaced in the 12th Century "where the injury was not a disseisin but rather an indirect damage to the land or an interference with its use and enjoyment." Copart Indus., Inc. v. Consol. Edison Co., 41 N.Y.2d 564, 567, 394 N.Y.S.2d 169, 171, 362 N.E.2d 968, 970 (1977). Approximately three centuries later, the common law cause of action emerged, making damages available "upon the

invasion of interests in the use and enjoyment of land, as well as of easements and profits." Id.

Under this theory

> [i]f abatement by judicial process was desired, resort to equity was required. Along with the civil remedy protecting rights in land, there developed a separate principle that an infringement of the right of the crown, or of the general public, was a crime and, in time, this class of offenses was so enlarged as to include any act not warranted by law, or omission to discharge a legal duty, which inconveniences the public in the exercise of rights common to all Her Majesty's subjects. At first, interference with the rights of the public was confined to the criminal realm but in time an individual who suffered special damages from a public nuisance was accorded a right of action.

Id. at 567-68, 394 N.Y.S.2d at 172, 362 N.E.2d at 971 (citing Stephen, General View of Criminal

Law of England [1890], p 105; Restatement, Torts, notes preceding § 822, pp 217-18; Prosser,

Torts [4th ed], pp 572-73) (internal quotations omitted).

New York's current jurisprudence governing the common law cause of action for public

nuisance teaches that

> [a] public, or as sometimes termed a common, nuisance is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency. It consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of person[s].

Next Millennium I, 2007 WL 2362144, at *14 (citing Copart Indus., Inc., 41 N.Y.2d at 568, 394

N.Y.S.2d at 172, 362 N.E.2d at 971). So instructed, it cannot be questioned that there was a

public nuisance at the West Side site. In fact, the manufacturer defendants do not dispute its

existence. Certainly, "the release or threat of release of hazardous waste into the environment

unreasonably infringes upon a public right," thus making such a release "a public nuisance as a

matter of New York law." Shore Realty Corp., 759 F.2d at 1051 (citing State v. Schenectady

22

Chems., 103 A.D.2d 33, 37, 479 N.Y.S.2d 1010, 1013 (3d Dept. 1984); State v. Monarch

Chems., Inc., 90 A.D.2d 907, 907, 456 N.Y.S.2d 867, 868-69 (3d Dept. 1982)). Therefore,

plaintiffs were most undoubtedly acting properly in abating the public nuisance at the site. But,

that is where the inquiry starts. Critically, this litigation is about the damages that plaintiffs

incurred in their past cleanup efforts, thus implicating the statute of limitations under CPLR 214-

c(2). Defendants argue that the complaint sufficiently establishes that the injury to the

environment in this case was discovered at least three years before the lawsuit was initiated,

which would bar the claim under CPLR 214-c(2). Plaintiffs demur in response, arguing,

alternatively, that CPLR 214-c(2) does not apply to the state in an action for public nuisance

where it is exercising its police powers in abating a public nuisance and is requesting equitable

relief to recover cleanup costs for a chemical waste site.

### 1. Applicability of CPLR 214-c(2)

CPLR 214-c states, in pertinent part, that

> the three year period within which an action to recover damages
> for . . . injury to property caused by the latent effects of exposure
> to any substance or combination of substances, in any form . . .
> upon or within property must be commenced shall be computed
> from the date of discovery of the injury by the plaintiff or from the
> date when through the exercise of reasonable diligence such injury
> should have been discovered by the plaintiff, whichever is earlier.

N.Y. C.P.L.R. 214-c(2) (McKinney 2010). The state claims that CPLR 214-c is inapplicable

because its public nuisance cause of action is not grounded in the tort of property damage, but,

rather it is grounded in the exercise of its police power. It asserts that it is merely seeking

equitable relief in the form of cost recovery for the state's cleanup efforts. (Mem. in Opp'n at

21-24). In so arguing, plaintiffs are commingling two theories. There are two possible forms of

relief available on this cause of action, but the one seeking pure monetary damages cannot be

23

characterized as equitable. In any event, the New York Court of Appeals has unequivocally held that the limitations period in CPLR 214-c only applies to actions for damages and does not bar any claims for injunctive relief. See Jensen, 82 N.Y.2d at 90-91, 603 N.Y.S.2d at 426, N.E.2d at 553. This goes back to the original theory of nuisance under which "if abatement by judicial process was desired, [a] resort to equity was required." Copart Indus., Inc., 41 N.Y.2d at 567, 394 N.Y.S.2d at 171, 362 N.E.2d at 970. Consequently, to the extent plaintiffs are seeking injunctive relief under a public nuisance theory for any **_additional_** cleanup of the site, they are certainly not barred by the statute of limitations applicable to a damages action. Indeed, "[u]nder common law, a continuing injury to real property gives rise to successive causes of action for the duration of the injury, and the right of the property owner to invoke the equitable power of the court similarly continues, regardless of the lapse of time that might occur before the commencement of legal proceedings." Next Millennium I, 2007 WL 2362144, at *15 (quoting Town of Oyster Bay v. Occidental Chem. Corp., 987 F. Supp. 182, 209-10 (E.D.N.Y. 1997)).

In contradistinction, the **_damages_** that plaintiffs seek to recover for their own cleanup efforts in the past simply cannot be characterized as the pursuit of equitable relief. Accepting the allegations in the complaint as true for purposes of this motion, defendants had in the past engaged in actions or omissions that created or contributed to or maintained a public nuisance at the West Side site. But, unlike any injunctive relief that might be sought for a cleanup yet to come, the cost recovery claim for that post nuisance-producing conduct is **_not_** equitable in nature, and, therefore, is clearly subject to CPLR 214-c.[4] See Next Millennium I, 2007 WL

---

[4] Relying solely on New York v. Gen. Elec. Co., a decision from Supreme Court, Albany County, the state argues that CPLR 214-c does not apply to a cause of action based on its cleanup of the site because, in doing so, it acted to preserve the public's health and environment, and a governmental duty is not a property right. (Mem. in Opp'n at 20-24). But plaintiffs' reliance on this case is misplaced. All else aside, it is simply inapplicable. In Gen. Elec. Co., the

24

2362144, at *14 (applying the provisions of CPLR 214-c where what the state was seeking under the public nuisance doctrine was merely "damages expended for its clean-up costs at the site for harm done to the land and groundwater"). Hypothetically, if a court were to order defendants to undertake additional remediation efforts at the site, and, in defiance of such an order, defendants refused to do so, that court could conceivably authorize the state to remediate the site further and obtain equitable relief from defendants in the form of compensation for the costs incurred by the state to comply with the equitable order in the stead of the defiant defendants. However, where, as here, the state simply chooses to take steps to abate the public nuisance itself, it has only a damages, or in the words of yesteryear, an action "at law" and not one in equity, and is required to satisfy the statute of limitations applicable to such an action for damages. To be clear, the question is not whether such damages are available in a suit on nuisance, rather it is whether, because the relief is solely monetary, it is subject to the statute of limitations imposed by CPLR 214-c. And the answer is, resoundingly, yes. CPLR 214-c is applicable to plaintiffs' public nuisance claim for damages based on costs already incurred.[5]

---

court held that CPLR 214-c did not apply to the state's public nuisance claim as the claim accrued daily under the traditional continuing wrong rule and, consequently, property rights were not at stake. New York v. Gen. Elec. Co., Index No. 6637-99, RJI No. 01-00-060996, Decision and Order, at 3-5 (Sup. Ct. Albany County, Sept. 14, 2000). Critically, at the time the defendants filed their motion to dismiss there, the state had not yet incurred any expenses in remediation. In fact, plaintiffs were seeking an order directing defendants to dredge a canal because the state needed an avenue of transportation to facilitate commerce. Here, the state has already incurred costs for cleanup of the West Side site and is merely seeking an award of compensatory damages. (Compl. ¶ 92). "[T]he state is seeking to force [defendants] to pay for *damages* caused to the land and groundwater by the dumping of hazardous wastes." Moulds 196 F. Supp. 2d at 220 (emphasis added). This form of relief is surely a property right to money that was spent to abate the public nuisance and prevent further harm, bringing CPLR 214-c into play.

[5] Plaintiffs' sixth cause of action, entitled "Damages to the Natural Resources of the State of New York under Common Law" is also essentially a damages claim under a public nuisance theory. (Compl. ¶ 110). The complaint states that defendants are liable under New York's "common law of public nuisance . . . and the New York Real Property and Proceedings Law §

## 2. The Limitations Period.

Given the applicability of CPLR 214-c to the state law nuisance claims seeking monetary damages, the Court must next determine whether that limitations statute in fact bars the claims. The statute commands that "the three year period within which an action to recover damages for . . . injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form . . . must be commenced shall be computed from the ***date of discovery of the injury*** by the plaintiff." N.Y. C.P.L.R. 214-c(2) (McKinney 2010) (emphasis added). The New York Court of Appeals has determined that the "date of discovery" is a term to be liberally construed. See Wetherill v. Eli Lilly, In re N.Y. County DES Litigation, 89 N.Y.2d 506, 509, 665 N.Y.S.2d 862, 863, 678 N.E.2d 474, 475 (1997) ("We hold that the time for bringing the action begins to run under the statute when the injured party discovers the primary condition on which the claim is based.") It must be interpreted to allow tolling in situations even where the plaintiff was aware of the injury itself, but not the cause. Id.

In determining the appropriate date for this type of cleanup action, there are two possible indicators of "discovery" of the injury: (1) the date the site was classified as a Class 2 inactive hazardous waste disposal site by DEC, and (2) the date DEC adopted the record of decision regarding the site. See Next Millennium I, 2007 WL 2362144, at *16-17.

Plaintiffs' complaint was filed in this action on October 10, 2007. (Compl. at 1, 20.)

---

841 for all damages or injury to, destruction, or loss of natural resources." (Id.) Section 841 of the Real Property Actions and Proceedings Law "authorizes the prosecution of an action against both the creator of a nuisance on real property and his grantee to abate the nuisance and for damages resultant therefrom." State v. Ole Olsen, Ltd., 38 A.D.2d 967, 968, 331 N.Y.S.2d 761, 763 (2d Dept. 1972). The validity of this claim also turns on whether an action for damages is time barred under CPLR 214-c. Incidentally, an action brought under Real Property and Proceedings Law by definition must arise out of a legally cognizable interest in real property. If the state has no such interest, as it contends on this motion, this cause of action must be dismissed on that ground alone.

Applying the statute of limitations, discovery of the injury must have occurred on or after October 10, 2004.

There is ample factual pleading in the complaint that discovery of the injury occurred well before that date. The site was classified as a Class 2 inactive hazardous waste disposal site by DEC in August, 1997. (Id. ¶ 53). This classification, by law, required an investigatory predicate and a finding that "the hazardous waste present[ed] a significant threat to the public health or environment," necessitating remedial action. Matter of Ithaca City School Dist. v City of Ithaca, 918 N.Y.S.2d 232, 233 n.1, 82 A.D.3d 1316, 1317 n.1 (3d Dept. 2011). See also Department of Environmental Conservation, Inactive Hazardous Waste Disposal Site Program, Fact Sheet on Preliminary Site Assessment (PSA), available at http://www.dec.ny.gov/chemical/8660.html (last visited June 3, 2011) (Before a site is classified, a PSA is conducted, which involves "a three-step investigation to determine if the site should be classified for remediation or delisted." It includes a background review, sampling of "exposed wastes, drums, surrounding soil and surface water," surveys, and groundwater monitoring.) The classification makes undeniable the fact that plaintiffs had notice of the claimed contamination—the injury—more than three years prior to the filing of the lawsuit. That DEC subsequently split the site into three operable units to determine the nature and extent of contamination and later still issued records of decision for each operable unit, is largely irrelevant to this inquiry. At the moment the PSA was complete and DEC officially classified the site a Class 2 inactive hazardous waste disposal site, the state officially announced that it had determined that "the presence of hazardous waste and the degree of health or environmental threat [could] be documented," id., which, at the very least, constitutes adequate *discovery* of the injury, the public nuisance caused by environmental contamination. Any claim for monetary cleanup damages

arising under state public nuisance law is time barred by CPLR 214-c(2) as a consequence.

## D. Restitution

Defendants also assert that plaintiffs' third cause of action for restitution fails under New York law. They argue that restitution "cannot rest on a time-barred duty that the defendant allegedly owed to the plaintiff." (Mem. in Supp. to Mot. to Dismiss at 15.) The theory is that since the state bases its restitution claim on public nuisance, and the duty under public nuisance is one owed to the state (but now time barred), the state's restitution claim fails as a matter of law. (Id. at 16).

Restitution is hardly a novel claim under New York law. It has been defined as follows:

> A person who has performed the duty of another by supplying things or services although acting without the other's knowledge or consent, is entitled to restitution from the other if (a) he acted unofficiously and with intent to charge therefor[e], and (b) the things or services supplied were immediately necessary to satisfy the requirements of public decency, health, or safety.

City of New York v. Lead Indust., 644 N.Y.S.2d 919, 923, 222 A.D. 2d 119, 125 (1st Dept. 1996) (quoting Restatement (First) of Restitution, § 115 (1937)). Plaintiffs adequately pleaded (1) that defendants had a duty to abate the public nuisance at the site; (2) that they failed to do so; (3) that the state discharged that duty, conferring a benefit on defendants; and (4) that defendants have been unjustly enriched. (Compl. ¶¶ 93-97). In addition, the complaint, read in its entirety, demonstrates that the services performed by the state in cleaning up the West Side site were "immediately necessary to satisfy the requirements of public decency, heath, or safety." Lead Indust., 644 N.Y.S. at 923, 222 A.D.2d at 125. The complaint surely alleged as well significant soil and groundwater pollution as a result of the contamination, (compl. ¶¶ 49-72), sufficient to make out a claim for restitution.

Defendants seek refuge anyway in Lead Indust., protesting that plaintiffs' claim is legally

insufficient. In <u>Lead Indust.</u>, the trial court granted the defendant's motion to dismiss the plaintiff's restitution claim, on the ground that it was premised on an identical time barred fraud claim that the plaintiff had also asserted. <u>Id.</u> at 921, 222 A.D.2d at 123. In reversing the trial court's decision, the Appellate Division clarified, however, that "it is the breach by [the] defendant of an underlying duty owed to a third party, even if the action based thereon by that party against defendant is time-barred, that is critical to a plaintiff's right to bring a [restitution] action." <u>Id.</u> at 924, 222 A.D.2d at 127. The First Department held that "[t]he thrust of the complaint [was] that plaintiffs took immediate action necessary to protect the health and safety of the residents of their buildings . . . from the well-recognized hazards of lead paint which had been manufactured and marketed by the defendant." <u>Id.</u>, 222 A.D.2d at 128.

Here, defendants certainly owed a duty to the public to abate and remediate the contamination on the West Side site that they allegedly caused. But noting that public nuisance is an offense against the state, they contend that the state is merely recasting its duty as a restitution claim. This argument holds no water. While the state is indeed the proper authority to enforce public nuisance claims, the rights infringed by the wrongdoer affect the general public directly. <u>See</u> <u>Copart Indus., Inc.</u>, 41 N.Y.2d at 568, 394 N.Y.S.2d at 172, 362 N.E.2d at 971. It is impossible to conclude that the only duty owed in the case of a public nuisance is to the state, where "rights common to all" have been affected. <u>Id.</u> Since the state has alleged that it performed a duty owed by defendants to the public at large and supplied services that were immediately necessary to satisfy the requirements of public decency, health, or safety, it has sufficiently pled a claim for restitution.

It is irrelevant, of course, that the same facts and circumstances may be time barred when pursued under some other theory. Independent causes of action must be assessed independently.

29

Because one type of claim is time barred does not require dismissal of all the rest. See, e.g., 55 Motor Ave. Co. v. Liberty Indus. Finishing Co., 885 F. Supp. 410, 424-25 (E.D.N.Y. 1994) (denying defendant's motion to dismiss independent restitution and indemnification claims in a CERCLA action between private parties.); Bedford Affiliates v. Manheimer, No. 95-cv-0116, 1997 U.S. Dist. LEXIS 23903, at *46-53 (E.D.N.Y. Aug. 6, 1997) (finding the claims for restitution and indemnification valid, albeit academic when coupled with successful CERCLA claims); Hickey's Carting, 380 F. Supp. 2d at 120-22 (finding that the state successfully pleaded restitution and indemnification causes of action in addition to CERCLA § 107 claims); Next Millennium I, 2007 WL 2362144, at *17-19 (same). Since plaintiffs have properly alleged the legal elements of a restitution claim under New York law and that claim itself is not time barred, defendants' motion to dismiss it is denied.

## E. **Indemnification**

Lastly, defendants move to dismiss the fourth cause of action, plaintiffs' indemnification claim. To properly make out a claim for implied-in-fact indemnity under New York law, a plaintiff must allege that "both parties . . . are subject to a duty to a third person under such circumstances that one of them, as between themselves, should perform it rather than the other." Lead Indus., 644 N.Y.S.2d at 922, 222 A.D.2d at 125 (citation omitted). The classic case for such indemnification "is where one, without fault on its own part, is held liable to a third party by operation of law (frequently statutory) due to the fault of another." Id. at 922-23, 222 A.D.2d at 125. In its complaint, the state fails to allege a critical element necessary to make out a valid indemnification claim—that it had a duty or obligation under the law to remediate the West Side site. See, e.g., id. at 922-25, 222 A.D.2d at 124-30 (the City of New York sufficiently pled an indemnification claim by alleging that it had a statutory and regulatory duty to its residents

which was imposed on the City at the fault of the plaintiff); Hickey's Carting, 380 F. Supp. 2d at 120 (the state properly pled an indemnification cause of action against the defendant by alleging that it had a duty to indemnify the town for 75% of its abatement costs and the defendant, if found liable, would also have a duty to indemnify the town all of the abatement costs); State v. Stewart's Ice Cream Co., 64 N.Y.2d 83, 88, 484 N.Y.S.2d 810, 812, 473 N.E.2d 1184, 1186 (1984) (Court of Appeals found that an indemnification action was proper where the state had a statutory duty to remediate petroleum contamination). But see Next Millennium I, 2007 WL 2362144, at *17-18 (allowing the state's indemnification claim to proceed even though basis for state's obligation to act was equivocal).

At bottom, since the state never identified and alleged in its complaint that it had a duty or legal obligation to remediate the West Side site, its indemnification claim fails as pled. Without such obligation, the state could never be at risk for incurring liability to a third party obligee for which the state would be entitled to indemnification upon satisfaction of the jointly-owed obligation. Instructively, pursuant to the New York Superfund statute, if a responsible party does not clean up the contamination at a site, the state has the authority (but not the obligation) to develop a remedial program. See N.Y. Envtl. Conserv. Law § 27-1313(5)(a) (McKinney 2004). Although it somewhat challenges reason that the state would be obliged at common law to perform a duty that the Superfund law (designed to expand remedies available at common law) does not impose, perhaps plaintiffs can, in good faith, specify the obligation upon which it relies.[6] For now, though, even accepting all factual allegations as true, the state has failed to advance a claim for indemnification upon which relief can be granted. The motion to

---

[6] The state, of course, might not want to acknowledge it has such a duty as a matter of law for fear of creating causes of action against it running to the benefit of property owners adjacent to every other Class 2 site in the state still unremediated.

dismiss the fourth cause of action is granted, but with leave to replead within 30 days of the date this Memorandum and Order is docketed.

## III.   <u>CONCLUSION</u>

For all the foregoing reasons, defendants' motion is granted to the extent that the public nuisance claims in the second and sixth causes of action are dismissed with prejudice as time barred and the fourth cause of action for indemnification is dismissed but with leave to replead in accordance with this Memorandum and Order. The balance of the motion is denied. Further, the parties are directed to continue discovery expeditiously.

**SO ORDERED.**

Dated: Brooklyn, New York
June 3, 2011

s/ENV

_____
ERIC N. VITALIANO
United States District Judge